IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALARMAX DISTRIBUTORS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. _____ |
| | ) | |
| vs. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| HONEYWELL INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff AlarMax Distributors, Inc. ("AlarMax"), by its attorneys, Buchanan Ingersoll & Rooney PC, alleges as follows for its Complaint against Defendant Honeywell International, Inc. ("Honeywell"):

## Introduction

1.     AlarMax brings this lawsuit seeking redress for Honeywell's material breaches of a Settlement Agreement and Supply Agreement as well as for its violation of the Section 2(a) of the Robinson-Patman Act amendments to the Clayton Act, 15 U.S.C. § 13(a), in connection with Honeywell's discriminatory pricing and other conduct directed to AlarMax.

## Jurisdiction and Venue

2.     This Court has original subject matter jurisdiction over this action pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.  This Court also has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a) because there is diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.     Venue is proper in the Western District of Pennsylvania pursuant to 15 U.S.C. §§ 15 and 22 as a district in which Defendant resides, is found and/or transacts business; and 28

U.S.C. § 1391(b) as a district in which the Defendant resides and/or conducts business, and in which a substantial part of the events giving rise to the claims occurred.  Service may be effected in this district pursuant to 15 U.S.C. § 22 as a district in which Defendant is found and/or transacts business.

4.      The conduct complained of herein has occurred in and had a substantial effect on interstate trade and commerce.

5.      In the two agreements between AlarMax and Honeywell at issue in this action, the parties agreed that, in the event of any dispute arising out of or relating to the agreements, legal action would be taken in this Court as the exclusive forum for the resolution of such legal action, provided that federal jurisdiction exists.  AlarMax and Honeywell further agreed to waive any objections to personal jurisdiction or venue in this Court.

### The Parties

6.      Plaintiff AlarMax is a Pennsylvania corporation with its principal office located at 381 Mansfield Avenue, Suite 205, Pittsburgh, PA  15220.

7.      Defendant Honeywell is a Delaware corporation with its principal office located at 101 Columbia Road, Morristown, New Jersey 07962.  ADI Global Distribution ("ADI") is the Honeywell electronic fire and security product distribution business.  Honeywell and ADI are sometimes referred to together herein as "Honeywell."

8.      Whenever this Complaint refers to any Honeywell act, deed or transaction, it means that such corporation engaged in such act, deed or transaction by or through its officers, directors, agents, employees or other representatives while they were actively engaged in the management, direction, control or transaction of its business or affairs.

9.      Specifically, Honeywell is responsible for the conduct of ADI as alleged herein.

**Facts**

10.     AlarMax is a wholesale distributor of electronic fire and security products for residential and commercial settings, including fire alarms, burglar alarms, closed circuit television (CCTV), access control, intercoms and structured cabling, and peripheral, closely related products and has been since 1990, both for new installation and for the maintenance, repair and enhancement of installed systems.  As used herein, the term "Electronic Fire and Security Products" shall refer to all of the above categories of products, whereas the term "Electronic Security Products" shall refer to the above listed products except for fire alarms and other electronic fire products.

11.     AlarMax had and has existing contractual or business relationships with a number of vendors (including manufacturers) of Electronic Fire and Security Products.

12.     The primary customers of wholesale distributors of Electronic Fire and Security Products are the many installers of residential and commercial electronic security systems in the United States, most of which are smaller independent professional installers, which tend to purchase brand systems with which they have prior experience and familiarity.  Wholesale distributors of Electronic Fire and Security Products also sell to governmental entities and schools.

13.     Honeywell is a diversified technology and manufacturing Fortune 100 company with 2013 sales in excess of $40 billion.

14.     ADI is admittedly the largest wholesale distributor of Electronic Fire and Security Products in the world, with over 100 locations throughout North America and over 180 locations worldwide.

15.    In addition to its overall size and strength in the wholesale distribution of Electronic Fire and Security Products, Honeywell also manufactures and distributes a number of Electronic Fire and Security Products, including fire alarms, fire alarm signals, burglar alarms, access control panels, software, smoke detectors and glass break and motion detection equipment.

16.    Honeywell/ADI sells Electronic Fire and Security Products to the same resellers and end users in the United States (including governmental entities and schools) as AlarMax, and Honeywell/ADI and AlarMax are direct competitors in the wholesale distribution of Electronic Fire and Security Products in the United States.

**The 2004 Dispute**

17.    Based on Honeywell's actions in 2003 and 2004, AlarMax had evidence that Honeywell intended to eliminate AlarMax's access to the entire range of Honeywell Electronic Fire and Security Products as well as AlarMax's access to Electronic Fire and Security Products via non-Honeywell vendors, and/or to cause those non-Honeywell vendors and manufacturers to sell to AlarMax only at discriminatorily unfavorable prices and terms.

18.    AlarMax's concerns focused on two different activities:  (1) Honeywell's supply to AlarMax of Electronic Fire and Security Products that Honeywell itself manufactured; and (2) Honeywell's perceived use of its market power to extract lower pricing and better promotions from vendors of Electronic Fire and Security Products that could not be extended to AlarMax because of exclusive pricing arrangements insisted upon by Honeywell.

19.    Additionally, AlarMax believed that Honeywell intended to terminate all of its independent distribution arrangements with AlarMax (as well as with other wholesale distributors) for both the Electronic Fire and Security Products that it currently owned and the

4

Electronic Fire and Security Products that Honeywell would subsequently acquire via acquisitions of other companies in the future, and then use its size and market power to seek exclusive arrangements and induce discriminatorily favorable pricing and terms from non-Honeywell vendors and manufacturers, thereby leading to huge sales increases for Honeywell to coincide with the loss of business to AlarMax.

20.     As a result, AlarMax prepared to sue Honeywell for its anticompetitive and predatory conduct, and in 2004, counsel for AlarMax presented a draft complaint to Honeywell alleging eleven causes of action against Honeywell, as follows:  violation of Section 2 of the Sherman Act (for attempted monopolization); violation of the Robinson-Patman Act (for knowing inducement of discriminatory prices and terms); violation of Section 1 of the Sherman Act (for participating in a manufacturer conspiracy in restraint of trade); an additional violation of Section 1 of the Sherman Act (for boycotting AlarMax through the use of discriminatory pricing and exclusive distribution arrangements); Pennsylvania restraint of trade; Pennsylvania unfair competition; tortious interference with existing contractual relations; tortious interference with prospective contractual relations; civil conspiracy; promissory estoppel/detrimental reliance; and breach of contract.

**The 2004 Settlement**

21.     Prior to AlarMax filing its complaint against Honeywell, AlarMax and Honeywell settled their dispute and executed a Settlement Agreement and a Supply Agreement, both dated September 20, 2004.  Copies of the Settlement Agreement and the Supply Agreement are not currently attached hereto because of their confidential nature, but they are in the possession of Defendant Honeywell.  AlarMax attempted to obtain Defendant Honeywell's consent to attach these Settlement Agreement and Supply Agreement to this Complaint, but Defendant Honeywell

did not provide that consent.  Section 1(a) of the Settlement Agreement allows AlarMax to disclose the terms of the Settlement Agreement and the Supply Agreement to the extent necessary to enforce their terms in a legal proceeding.

22.     The Settlement Agreement pertains to:  (1) Honeywell's obligation to supply AlarMax with electronic fire products that Honeywell (or its affiliates) manufactures and sells through distribution; (2) Honeywell's obligations to ensure that its sales of Electronic Fire and Security Products to AlarMax will not commercially disadvantage AlarMax as compared to other distributors (including ADI); and (3) Honeywell's obligations not to use its market power to obtain exclusive lower pricing and better promotions from third party vendors or manufacturers of Electronic Fire and Security Products.

23.     Section 4 of the Settlement Agreement focuses in part on Honeywell's continued supply to AlarMax of the electronic fire products that Honeywell itself distributes, including without limitation Fire-Lite, Silent Knight and System Sensor products sold in distribution.

24.     With respect to the pricing of those electronic fire products, Honeywell agrees that "AlarMax *will not be disadvantaged on the final purchase price* (including all discounts, rebates, or any other incentive programs), and/or payment or warranty terms for electronic fire products *as compared to other third party distributors in the same channel or ADI . . . .*"  Section 4(b) (emphasis added).

25.     Section 5 of the Settlement Agreement focuses both on the pricing that Honeywell offers to AlarMax as compared to what it offers to other distributors (such as ADI) for Electronic Fire and Security Products sold in North America, and on the price and payment terms that Honeywell/ADI receives from third party vendors or manufacturers of Electronic Fire and Security Products.

26. Specifically:

- In Section 5(a), Honeywell agrees that the terms and conditions (including pricing) of any sales by Honeywell to AlarMax of Electronic Fire and Security Products will be "competitive and shall not commercially disadvantage AlarMax" as compared to other distributors, including ADI.

- In Section 5(b), Honeywell agrees to "not induce or knowingly accept more favorable price or payment terms, as compared to AlarMax, from non-Honeywell manufacturers" and to not "knowingly induce non-Honeywell manufacturers, or sellers, of Electronic Fire and Security Products to provide more favorable prices to Honeywell for Electronic Fire and Security Products" with the understanding "that such prices will be provided exclusively to Honeywell or with the understanding that Honeywell will receive a lower price than AlarMax receives" from that vendor or manufacturer.

- In Sections 5(c) and 5(d), Honeywell agrees that it "shall not enter into exclusive sale or distribution agreements, or otherwise suggest, encourage or coerce exclusive dealings, with non-Honeywell manufacturers" except in very limited joint development circumstances not applicable here and, in Section 5(d), that it "shall not facilitate, encourage or coerce non-Honeywell manufacturers [of Electronic Fire and Security Products sold in North America] to boycott AlarMax."

- In Section 5(f), Honeywell agrees not to offer package discounts and kits with pricing differentials that coerce the package purchase.

27. The Settlement Agreement, which is governed by Pennsylvania law, remains in effect.

28. The Supply Agreement pertains to Honeywell's obligation to supply AlarMax with Electronic Security Products that AlarMax previously bought, or currently or in the future will buy from companies that Honeywell acquired or will acquire.

29. The Supply Agreement between AlarMax and Honeywell ensures that Honeywell would sell to AlarMax the Electronic Security Products that AlarMax previously bought, or currently or in the future buys from companies Honeywell acquired or will acquire (collectively defined as "Supplied Products" in the Supply Agreement), in the quantity ordered by AlarMax, for resale by AlarMax without restriction (§ 2.1), and like the Settlement Agreement, the Supply

Agreement also ensured that AlarMax would not be disadvantaged on the final purchase price and payment terms for those products (including all discounts, rebates, or any other incentive programs) as compared to other distributors, including ADI (§ 3.2).

30.     In addition, Section 3.1(b) of the Supply Agreement ensures that, "[i]f any additional [Electronic Security Products] are identified by AlarMax" that were not included in the list of products attached to the Supply Agreement, the price for such new products would be "negotiated in good faith by the parties" and would be covered by the provisions of the Supply Agreement. *Id.* at § 3.1(b).

31.     The Supply Agreement further requires that Honeywell provide AlarMax "reasonable technical and sales support regarding" Electronic Security Products. *Id.* at § 2.4.

32.     The Supply Agreement, which is also governed by Pennsylvania law, remains in effect.

**Honeywell's April 10, 2014 Affidavit**

33.     Until recently, AlarMax was unaware that Honeywell had not been abiding by the terms of the 2004 Settlement Agreement and Supply Agreement, other than an occasional issue that would be resolved by the parties. In April 2014, an officer of Honeywell submitted a sworn statement in court which made it clear that Honeywell was breaching the 2004 Settlement Agreement and Supply Agreement.

34.     In April 2014, in connection with an unrelated action currently pending in the Allegheny County Court of Common Pleas between AlarMax and Altronix Corporation (a third-party manufacturer of low-voltage power supplies and accessories), Joshua Foster, the Vice President and General Counsel of the Honeywell Security Group, of which ADI is a part, filed an Affidavit on behalf of Honeywell that made clear that Honeywell was engaging in unlawful

pricing activity in knowing violation of the Settlement Agreement and the Supply Agreement, and to AlarMax's detriment.

35.     In his Affidavit, Mr. Foster stated that he is "involved in contract and sales negotiation with manufacturers, including Altronix," and that he is "familiar with the terms and conditions of Altronix's contracts and/or relationship with ADI affecting the ultimate cost of Altronix's products to ADI (including but not limited to price and pricing policy, rebates, specials, prepayment incentives and terms and conditions." *See* Foster Affidavit at ¶ 3; a true and correct copy of Mr. Foster's Affidavit is attached hereto as Exhibit 1 and incorporated herein by reference.

36.     Mr. Foster, on behalf of Honeywell, further opined that providing information to AlarMax as to the cost at which Altronix sells ADI its products "would provide AlarMax with an unfair competitive advantage over ADI," because AlarMax would be able to adjust its prices to sell Altronix products "at lower prices to undercut ADI" and "erode the profit margins at which [ADI] sell[s] Altronix products." *Id.* at ¶ 10.

37.     Mr. Foster's Affidavit makes clear that Honeywell, in knowing violation of the Settlement Agreement, is receiving pricing from vendors, including Altronix, better than pricing extended to AlarMax and did not want AlarMax to know this information.

38.     Honeywell further indicated that allowing AlarMax to know the lower Altronix pricing would allow AlarMax to compete against ADI with lower prices advantageous to customers, to which Honeywell objected.

39.     The Foster Affidavit is an admission that Honeywell was breaching and is continuing to breach the Settlement Agreement and the Supply Agreement.

**Honeywell/ADI's Breaches of the Settlement Agreement**

40.     Following a discussion between Bill Teitelbaum of AlarMax and Michael Flink, President of Honeywell, regarding the Foster Affidavit and the breach by Honeywell of the Settlement and Supply Agreement, AlarMax researched ADI's activities in the marketplace and found numerous, additional breaches by Honeywell of the Settlement Agreement and the Supply Agreement.

41.     On May 30, 2014, counsel for AlarMax provided written notice of Honeywell's breaches of the Settlement Agreement and the Supply Agreement to the President of Honeywell Security Group and the General Counsel of Honeywell.  Counsel for AlarMax also requested that Honeywell cure its breaches and resolve the matter prior to litigation.

42.     Despite communications between counsel for AlarMax and Mr. Foster, counsel for Honeywell, Honeywell failed to cure its breaches.

43.     Honeywell is inducing and knowingly accepting pricing from non-Honeywell vendors of Electronic and Fire Security Products on an exclusive basis that is lower than those vendors extend to AlarMax, in violation of the Settlement Agreement.

44.     Additionally, Honeywell electronic fire product companies, such as System Sensor, are in fact disadvantaging AlarMax in its final purchase price of electronic fire products, by providing lower pricing and/or rebates to ADI for those Honeywell fire products that are not extended to AlarMax.

45.     In addition, ADI sales flyers include pricing for Fire-Lite, Silent Knight and System Sensor electronic fire products that is at or below what AlarMax pays to Honeywell for those products.

46.     In other words, ADI offers products for sale at prices below what AlarMax pays to Honeywell companies for the electronic fire products in the first instance and also offers packages of Honeywell electronic fire products priced below the combined individual prices that AlarMax pays.

47.     ADI could only offer such pricing on those electronic fire products in two circumstances:  (1) if it is paying a lower price than AlarMax, or (2) if it is using a rebate or other promotional price that AlarMax does not receive.  Either instance is a violation of Sections 4(b) and 5(a) of the Settlement Agreement, and in either instance AlarMax has paid too much for electronic fire products from Honeywell and; as a result, has sold far fewer products than it would have if it had not been disadvantaged in its final price for those products.

48.     Honeywell/ADI's ability to offer packages of Honeywell electronic fire products priced below the combined individual prices that AlarMax pays is a violation of Section 5(f) of the Settlement Agreement.

49.     Honeywell has violated and is continuing to violate Sections 5(b) and 5(c) of the Settlement Agreement by inducing exclusive promotions and pricing more favorable than AlarMax receives.

50.     The 2011 ADI Vendor Agreement ("Vendor Agreement") currently in use, by its own terms, makes Honeywell/ADI's lower pricing on all of the products that it purchases from its vendors exclusive to Honeywell/ADI, in violation of Section 5(b) of the Settlement Agreement.

51.     The Vendor Agreement states that any vendor selling its Electronic Fire and Security Products to Honeywell "shall provide sufficient quantities of Products to ADI at its lowest price (including incentives, rebates and other offers)" and then insists that all vendors

must provide an <u>additional rebate</u> "equal to five percent (5%) of ADI's monthly purchases of Products. . . ." *See* Vendor Agreement at §§ 1.2, 3.2 (emphasis added).

52.     Thus, by its own terms, only Honeywell receives the lowest pricing from vendors, and no one else.  In fact, there is no way for a vendor to offer the same low pricing given to ADI to AlarMax without breaching the Vendor Agreement – because by doing so, the vendor would, by definition, not be giving Honeywell its lowest price.  The pricing provisions in the Vendor Agreement are circular in nature and mandate exclusivity.

53.     In addition, the Vendor Agreement provides that Honeywell will receive an additional 20% discount on the initial order of each Product that may be displayed in any branch. *Id.* at § 5.2.

54.     The Vendor Agreement also gives ADI the right to audit a vendor's books and records "relating to pricing of Products to ensure compliance" with the Vendor Agreement (§ 2.5).

55.      AlarMax also located a two-part ADI Power Point presentation dating from 2011 that demonstrates how insistent ADI has been that vendors sign the Vendor Agreement and touts the lower pricing ADI must receive, which results in higher sales volume.

56.     The presentation notes that ADI demands a 25%+ discount on promotions, which is well below what AlarMax is paying for products. *See* Presentation, Part II.

57.     The presentation also notes that Honeywell/ADI can sell an average 300%  and more in increased unit sales and "many increases of 1000%++" in sales, driven by the lower pricing exclusively extended to ADI. *See id.*

58.     AlarMax located public power point presentations from the 2014 ADI Supplier Partner Symposium that reflect a continued boasting of market dominance.

59.     The presentation at the 2014 Symposium by Michael Flink, President of ADI, noted that ADI is the "world's largest low voltage distributor" and that ADI has 180 sales locations, 18 distribution centers, offices in 20 countries, 2,500+ associates, 100,000+ customers, and 4,200,000+ orders per year.  *See* Presentation by Michael Flink.

60.     In addition, Flink presented a slide at the 2014 Symposium asking, "If you want to get to $5M per year, How?!?!? – It's a numbers game at ADI" and later asked, "Are you really happy with a few million?????"  *See* Presentation by Michael Flink.

61.     In addition, John Sullivan, Senior VP of Sales for ADI Americas, stated that one of ADI's goals is to "Never Lose an Order" and asked the audience, "What are you buying elsewhere that you could buy from ADI?"  *See* Presentation by John Sullivan.

62.     AlarMax has requested the same promotions and pricing from vendors that ADI receives, but vendors have repeatedly stated that they are not permitted by ADI to do so.

63.     Vendors such as Edwards Signaling, Proficient Audio, Viking Electronics, Arecont Vision, and others have refused to sell to AlarMax because of exclusive agreements with ADI and the fear of repercussions from ADI, in violation of Sections 5(b), 5(c), and 5(d) of the Settlement Agreement.

64.     Because Honeywell/ADI have for many years induced exclusive promotions and pricing more favorable than AlarMax receives from the numerous vendors who have signed the Vendor Agreement as well as other vendors, AlarMax has suffered damage.

65.     In addition, because a clear differential has existed and continues to exist between the prices that AlarMax paid vendors and Honeywell/ADI paid vendors for the same products over several years because of Honeywell/ADI's unlawful inducement of exclusive favorable prices, AlarMax has suffered substantial price discrimination.

66.     By way of further example, AlarMax learned that a vendor of electronic security products recently raised its prices to AlarMax and all its other customers except ADI in order to accommodate ADI's demands for additional price concessions on the vendor's products which the vendor could not give, which demands by ADI were in violation of Section 5(b) of the Settlement Agreement.

**Honeywell/ADI's Breaches of the Supply Agreement**

67.     Honeywell's recent activities also constitute violations of multiple provisions of the Supply Agreement.

68.     For example, Honeywell has refused to supply Electronic Security Products not originally included in Exhibit A to the Supply Agreement, entitled "Prices For Certain Supplied Products," even though Section 2.1, through the use of the defined term "Supplied Products," requires Honeywell to do so, and even though Section 3.1(b) of the Supply Agreement requires Honeywell to negotiate pricing for those new products "in good faith."  Supply Agreement, §§ 2.1, 3.1(b).

69.     In addition, Honeywell has failed to provide any technical and sales support to AlarMax, as required in Section 2.4 of the Supply Agreement.

70.     In addition, Honeywell's actions with respect to pricing, as set forth in Paragraphs 33 through 66 herein, constitute violations of Section 3.2 of the Supply Agreement, which states that AlarMax will not be disadvantaged on the final purchase price or payment and warranty terms as compared to other distributors and that "the purchase price and terms (including but not limited to payment terms) for any [products] purchased hereunder shall be at the *lowest price and most advantageous terms afforded*" to any distributors for the applicable product.  Supply Agreement, § 3.2 (emphasis added).

## COUNT I
## BREACH OF CONTRACT

71.     AlarMax incorporates herein by reference the allegations in Paragraphs 1-70 above, as if set forth at length.

72.     The Settlement Agreement and the Supply Agreement between AlarMax and Honeywell remain in effect.

73.     Honeywell's conduct as described herein constitutes material breaches of the Settlement Agreement in the following ways:

- Honeywell has materially breached Section 4(b) of the Settlement Agreement by seeking to disadvantage AlarMax on the final purchase price and/or payment or warranty terms on the electronic fire products (including Fire-Lite, Silent Knight and System Sensor products) that AlarMax purchases from Honeywell;

- Also in material breach of Section 4(b) of the Settlement Agreement, System Sensor (one of the Honeywell electronic fire product companies) is disadvantaging AlarMax in its final purchase price of electronic fire products, through the provision of rebates to ADI that are not extended to AlarMax;

- Honeywell/ADI has also materially breached Section 4(b) of the Settlement Agreement by offering for sale Fire-Lite, Silent Knight and System Sensor products at prices that are at or below what AlarMax pays to the vendor for the products in the first instance, either by paying a lower price than AlarMax, or through the use of a rebate in excess of what AlarMax receives;

- These three material breaches of Section 4(b) of the Settlement Agreement also constitute material breaches of Section 5(a) of the Settlement Agreement, which Honeywell has committed by ensuring that the terms and conditions (including pricing) of any sales by Honeywell to AlarMax of the electronic fire products described above are commercially disadvantageous to AlarMax and not competitive as compared to other distributors, including ADI;

- Honeywell has materially breached Section 5(b) of the Settlement Agreement by inducing and knowingly accepting more favorable price or payment terms, as compared to AlarMax, from non-Honeywell vendors and manufacturers on an exclusive basis;

- In addition, Honeywell has knowingly induced non-Honeywell vendors of Electronic Fire and Security Products to provide more favorable prices to Honeywell for Electronic Fire and Security Products to be sold unaltered in

distribution, with the understanding that such prices would be provided exclusively to Honeywell and knowing that such pricing is lower than AlarMax receives from those vendors, in violation of Section 5(b) of the Settlement Agreement;

- Honeywell has also materially breached Sections 5(b) and 5(c) of the Settlement Agreement by demanding, through its Vendor Agreement, that any vendor selling its products to ADI shall do so "at its lowest price (including incentives, rebates and other offers)" and then insisting that all vendors provide an additional rebate "equal to five percent (5%) of ADI's monthly purchases of Products. . . ." Thus, by the terms of its own Vendor Agreement and in violation of Section 5(b) of the Settlement Agreement, only Honeywell/ADI receives the lowest pricing from vendors, and no one else;

- Honeywell has materially breached Sections 5(b), 5(c), and 5(d) of the Settlement Agreement by facilitating, encouraging and coercing non-Honeywell vendors to refuse to sell to, or otherwise boycott, AlarMax;

- In addition, Honeywell has also materially breached Section 5(b) of the Settlement Agreement by demanding additional price concessions on vendor's Electronic Security Products, causing the vendor to increase the price that it charges to AlarMax and all its other customers for the products, except for ADI;

- Honeywell has materially breached Section 5(f) of the Settlement Agreement by offering packaged discounts and kits with price differentials that coerce the package purchase.

74.    Honeywell's conduct as described herein constitutes material breaches of the

Supply Agreement in the following ways:

- Honeywell has refused to supply Electronic Security Products not originally included on Exhibit A of the Supply Agreement, entitled "Prices For Certain Supplied Products," in violation of Section 2.1 of the Supply Agreement even though Section 2.1 uses the defined term "Supplied Products" to include the Electronic Security Products that AlarMax may in the future buy from Honeywell;

- Honeywell has materially breached Section 2.4 of the Supply Agreement by failing to provide any "technical and sales support regarding" the products that AlarMax purchases from Honeywell;

- Honeywell has materially breached Section 3.1(b) of the Supply Agreement by refusing to negotiate pricing for new Electronic Security Products not originally included in the list of products attached to the Supply Agreement; and

- Honeywell has materially breached Section 3.2 of the Supply Agreement by disadvantaging AlarMax on the final purchase price and payment terms (including all discounts, rebates, or any other incentive programs) for Electronic Security Products as compared to other distributors.

75.    AlarMax has fulfilled all of its obligations under the Settlement Agreement and the Supply Agreement, and nothing AlarMax has done excuses Honeywell's breaches of those contracts between the parties in any way.

76.    Honeywell's breaches of the Settlement Agreement and the Supply Agreement have caused AlarMax to suffer substantial losses, as a result of the following:  the payment of higher final prices for Electronic Fire and Security Products from non-Honeywell vendors and manufacturers due to Honeywell's exclusive arrangements; lost business resulting from said payment of higher final prices; the payment of higher prices for electronic fire products purchased from Honeywell; lost business resulting from said payment of higher final prices; the payment of higher prices for Electronic Security Products purchased from Honeywell; lost business resulting from said payment of higher final prices; lost business resulting from Honeywell's refusal to supply AlarMax with certain Electronic Security Products; lost profits/margins as a result of the above; and/or other damage as may be proved at trial.

77.     Despite its efforts to mitigate damages, AlarMax continues to be materially damaged.

**COUNT II**
**ROBINSON-PATMAN VIOLATION:**
**KNOWING INDUCEMENT OF DISCRIMINATORY PRICES**
**AND TERMS AGAINST HONEYWELL**

78.    AlarMax incorporates herein by reference the allegations in Paragraphs 1-77 above, as if set forth at length.

79.     The Electronic Fire and Security Products re-sold by Honeywell/ADI and AlarMax are commodities within the meaning of Section 2(a) of the Robinson-Patman Act amendments to the Clayton Act, 15 U.S.C. § 13(a).

80.     In the course and conduct of its business in commerce, Honeywell/ADI has knowingly induced discriminatory prices, including payment, freight terms and rebates, from non-Honeywell vendors with respect to Electronic Fire and Security Products for re-sale that are substantially more favorable than those vendors offer or sell to AlarMax or other distributors.

81.     The Vendor Agreement, by its own terms, makes the lower pricing that Honeywell receives from vendors exclusive to Honeywell.

82.     The Electronic Fire and Security Products on which Honeywell/ADI has knowingly induced discriminatorily favorable prices and terms are the same products, of the same grade and quality, contemporaneously sold to AlarMax, affecting the ability of AlarMax to compete with ADI for the re-sale of such products to installers.

83.     Honeywell/ADI purchase the Electronic Fire and Security Products on which they have knowingly induced discriminatorily favorable prices and terms for use and resale within the United States, just as AlarMax purchases those same products from vendors at a higher price for use and resale within the United States.

84.     By way of example, Altronix, Wheelock, RCI, Ditek, Bosch, Flir and others have sold their Electronic Fire and Security Products to AlarMax at prices higher than the ones paid contemporaneously by Honeywell/ADI for those same products, and Edwards Signaling, Proficient Audio, Viking Electronics, Arecont Vision and other vendors have refused to sell to AlarMax because of exclusive agreements with ADI and/or the fear of repercussions from ADI.

85.     Thus, AlarMax paid higher prices for the same Electronic Fire and Security Products that ADI purchased from the same vendors over the course of several years.  Given that AlarMax purchases in excess of $50 million a year in Electronic Fire and Security Products from vendors, and based solely on the 5% price discount ADI requires in its Vendor Agreement, the price difference is significant.

86.     Honeywell/ADI's knowing inducement of discriminatory pricing and terms has occurred over an extended period, including in connection with the introduction of the Vendor Agreement currently in place and is further evidenced by the sworn statements contained in the Foster Affidavit.

87.     In each instance, Honeywell/ADI's knowing inducement of discriminatory pricing and terms has harmed AlarMax's ability to compete with ADI, causing AlarMax to pay more than ADI across the board for the same products and substantially more on certain products, as well as to enjoy less favorable payment, freight terms and rebates as compared to ADI.

88.     Honeywell/ADI's knowing inducement of discriminating pricing and terms has caused AlarMax to suffer lost profits and sales over several years.

89.     Another effect of Honeywell/ADI's knowing inducement has been to substantially lessen competition in the wholesale distribution of Electronic Fire and Security Products, in which ADI and AlarMax directly compete, and to injure, destroy or prevent competition between ADI and AlarMax or other wholesale distributors.

90.     The acts and practices of Honeywell/ADI described above constitute unlawful inducement of price discrimination in violation of Section 2(f) of the Robinson-Patman amendments to the Clayton Act, 15 U.S.C. § 13(f).

91.     As a direct and proximate result of Honeywell/ADI's knowing inducement of discriminatory pricing and terms, competition in the sale of Electronic Fire and Security Products has been lessened, and AlarMax has paid higher prices and lost business and profit/margin as a result, with damages in an amount not yet determined.  AlarMax is entitled to the recovery of said damages, trebled, as well as applicable interest and the costs of suit, including attorneys' fees.

## AS TO BOTH COUNTS

### Relief Requested

WHEREFORE, Plaintiff AlarMax demands judgment against Defendant Honeywell, for breaches of the 2004 Settlement Agreement, breaches of the 2004 Supply Agreement, and violation of Section 2(f) of the Robinson-Patman Act, as follows:

(1)     Awarding compensatory damages to AlarMax under Counts I and II of the Complaint in an amount to be proved at trial, which amount exceeds $75,000, exclusive of interest and costs;

(2)     Trebling the damages proved by AlarMax under Count II (Robinson-Patman) as authorized by statute and awarding those damages to AlarMax;

(3)     Awarding to AlarMax its costs, any applicable interest and attorneys' fees as authorized by statute; and

(4)     Awarding to AlarMax such other and further relief as the Court deems just and proper.

**A TRIAL BY JURY IS DEMANDED.**

Dated:  November 6, 2014          BUCHANAN INGERSOLL & ROONEY PC

                              By:  s/ Gretchen L. Jankowski

                              Gretchen L. Jankowski
                              gretchen.jankowski@bipc.com
                              (Pa. I.D. No. 74540)
                              Wendelynne J. Newton
                              wendelynne.newton@bipc.com
                              (Pa. I.D. No. 35163)
                              Christopher A. Amar
                              christopher.amar@bipc.com
                              (Pa. I.D. No. 309707)

                              One Oxford Centre
                              301 Grant Street, 20th Floor
                              Pittsburgh, PA  15219-1410
                              Tel:  (412) 562-8800
                              Fax:  (412) 562-1041