**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALARMAX DISTRIBUTORS, INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 14-01527** |
| **vs.** | ) | **District Judge David S. Cercone** |
| | ) | **Chief Magistrate Judge Maureen P. Kelly** |
| | ) | |
| **HONEYWELL INTERNATIONAL, INC.,** | ) | |
| **Defendant.** | ) | **Re: ECF No. 18** |
| | ) | |

**REPORT AND RECOMMENDATION**

**KELLY, Chief Magistrate Judge**

**I.      RECOMMENDATION**

Plaintiff AlarMax Distributors, Inc. ("AlarMax" or "Plaintiff") initiated this action by filing a Complaint on November 6, 2014, seeking redress for the actions of Defendant Honeywell International, Inc. ("Honeywell" or "Defendant") which allegedly constitute breaches of two contracts entered into by the parties and violations of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13 (the "RPA").  (ECF No. 1).  Pending before the Court is Honeywell's Motion to Dismiss.  (ECF No. 18).

For the following reasons, it is respectfully recommended that Honeywell's Motion to Dismiss, ECF No. 18, be GRANTED in part and DENIED in part.

**II.      REPORT**

**A.      STANDARD OF REVIEW**

In considering a Rule 12(b)(6) motion, federal courts require notice pleading, as opposed to the heightened standard of fact pleading.  Federal Rule of Civil Procedure 8(a)(2) requires

only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds on which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

Building upon the landmark United States Supreme Court decisions in Twombly and Ashcroft v. Iqbal, 556 U.S. 662 (2009), the United States Court of Appeals for the Third Circuit explained that a District Court must undertake the following three steps to determine the sufficiency of a complaint:

> First, the court must "take note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Third, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (quoting Iqbal, 556 U.S. at 675, 679) (internal alterations omitted). The third step of this sequential evaluation requires this Court to consider the specific nature of the claims presented and to determine whether the facts pled to substantiate the claims are sufficient to show a "plausible claim for relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). "'While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.'" Henry v. City of Erie, 728 F.3d 275, 280 (3d Cir. 2013) (quoting Iqbal, 556 U.S. at 679). This Court may not dismiss a complaint merely because it appears unlikely or improbable that Plaintiff can prove the

facts alleged or will ultimately prevail on the merits.  <u>Twombly</u>, 550 U.S. at 563 n.8.  Instead, this Court must ask whether the facts alleged raise a reasonable expectation that discovery will reveal evidence of the necessary elements.  <u>Id.</u> at 556. Generally speaking, a complaint that provides adequate facts to establish "how, when, and where" will survive a motion to dismiss. <u>Fowler</u>, 578 F.3d at 212; <u>see also</u> <u>Guirguis v. Movers Specialty Servs., Inc.</u>, 346 F. App'x. 774, 776 (3d Cir. 2009).  In short, a motion to dismiss should not be granted if a party alleges facts, which could, if established at trial, entitle him/her to relief.  <u>Twombly</u>, 550 U.S. at 563, n.8.

Given this general standard, it is important to note that "antitrust claims are not subject to a heightened standard of pleading."  <u>Mumford v. GNC Franchising LLC</u>, 437 F. Supp. 2d 344, 348 (W.D. Pa. 2006) (citing <u>Lum v. Bank of America</u>, 361 F.3d 217, 220 (3d Cir. 2004)).  To the contrary, the United States Court of Appeals for the Third Circuit has explained that district courts "should be extremely liberal in construing antitrust complaints."  <u>Knuth v. Erie-Crawford Dairy Coop. Ass'n</u>, 395 F.2d 420, 423 (3d Cir. 1968) (quoting <u>United States v. Employing Plasterers' Ass'n</u>, 347 U.S. 186, 189 (1954) ("'whether the charges be called 'allegations of fact' or 'mere conclusions of the pleader,' they must be taken into account in deciding' whether a claim for relief is stated.")).  At least part of the rationale for this "liberal" approach is the recognition that "'the proof is largely in the hands of the alleged [violators],'" in antitrust cases. <u>Hosp. Bldg. Co. v. Trustees of Rex Hosp.</u>, 425 U.S. 738, 746 (1976) (quoting <u>Poller v. Columbia Broadcasting</u>, 368 U.S. 464, 473 (1962)).  As such, "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."  <u>Id.</u>  Overall, the proponent of dismissing an antitrust complaint must meet a "concededly rigorous standard."  <u>Id.</u>

## B.     FACTUAL AND PROCEDURAL BACKGROUND

According to the Complaint, AlarMax is a Pennsylvania corporation which has dealt in the wholesale distribution of electronic fire and security products[1] for use in residential and commercial applications since 1990.  (ECF No. 1, at ¶¶ 6, 10).  Honeywell is a Fortune 100 diversified technology and manufacturing company incorporated in Delaware with a portfolio of products that includes a number of electronic fire and security products, such as those it markets under the names Fire-Lite, Silent Knight, and System Sensor.  (ECF No. 1, at ¶¶ 13, 15, 22).  In addition to its relevant manufacturing activities, Honeywell also operates ADI Global Distribution ("ADI"), the largest wholesale distributor of electronic fire and security products in the world.  (ECF No. 1, at ¶¶ 7, 14).  The electronic fire and security products distributed by AlarMax and ADI are manufactured by Honeywell and several other companies, such as Altronix, Wheelock, RCI, Ditek, Bosch, Flir, Edwards Signaling, Proficient Audio, Viking Electronics, and Arecont Vision.  (ECF No. 1, at ¶ 84).  AlarMax and ADI are direct competitors in the United States, each selling primarily to system installers, government entities, and schools.  (ECF No. 1, at ¶¶ 12, 16).

In 2003 and 2004, AlarMax claims to have become aware of certain anti-competitive activities engaged in by Honeywell.  (ECF No. 1, at ¶ 17).  In particular, AlarMax asserts that Honeywell intended to terminate all third-party distribution of its own electronic fire and security products and was using its market power to extract unfair and discriminatory pricing terms from other manufacturers.  (ECF No. 1, at ¶¶ 17-19).  In response to these actions, AlarMax presented

---

[1] Unless specifically noted, "electronic fire and security products," as discussed herein, refers to fire alarms, burglar alarms, closed circuit television, access control, intercoms, structured cabling, and other closely related products.  (ECF No. 1, at ¶ 10).

a draft complaint to Honeywell on April 19, 2004, alleging multiple antitrust violations and several related state causes of action.  (ECF No. 1, at ¶ 20; ECF No. 26-1, at p. 4).  However, before litigation was formally initiated, the parties were able to negotiate a settlement on September 20, 2004, when they contemporaneously executed both a Settlement Agreement and a Supply Agreement.  (ECF No. 1, at ¶ 21; ECF No. 26-1; ECF No. 26-2).

By executing the Settlement Agreement, Honeywell agreed to the following relevant terms.  First, Section 4(b) requires Honeywell to continue to supply certain electronic fire products to AlarMax, including Fire-Lite, Silent Knight, and System Sensor products.  (ECF No. 1, at ¶ 23; ECF No. 26-1, at p. 5).  Further, AlarMax must "not be disadvantaged on the final purchase price (including all discounts, rebates, or any other incentive programs), and/or payment or warranty terms for electronic fire products as compared to other third party distributors in the same channel or ADI."  (ECF No. 1, at ¶ 24; ECF No. 26-1, at p. 6).[2]  Second, concerning Honeywell's purchase of electronic fire and security products, Section 5(b) precludes Honeywell from "induc[ing] or knowingly accept[ing] more favorable price or payment terms, as compared to AlarMax, from non-Honeywell manufacturers."  (ECF No. 1, at ¶ 26; ECF No. 26-1, at p. 7).  Third, pursuant to Section 5(c), Honeywell must generally "not enter into exclusive sale or distribution agreements, or otherwise suggest, encourage or coerce exclusive dealings, with non-Honeywell manufacturers."  (ECF No. 1, at ¶ 26; ECF No. 26-1, at pp. 7-8).  Fourth, according to Section 5(d), Honeywell must not encourage other manufacturers to boycott AlarMax.  (ECF No. 1, at ¶ 26; ECF No. 26-1, at p. 8).  Finally, Section 5(f) prohibits Honeywell

_____

[2] Section 5(a) applies a similar requirement to electronic fire *and* security products, stating that "any sales by Honeywell to AlarMax shall be competitive and shall not commercially disadvantage AlarMax vis-á-vis other distributors (such as ADI) in which Honeywell has an economic interest."  (ECF No. 26-1, at p. 7).

from pricing "packaged" products in such a way that "the pricing differential between the separate products and the packaged products . . . unlawfully coerces the package purchase." (ECF No. 26-1, at p. 9).

The scope of the Supply Agreement is limited to electronic security products to be supplied by Honeywell to AlarMax. (ECF No. 26-2, at p. 2). Similar to the provisions of the Settlement Agreement, Section 3.2 of the Supply Agreement necessitates that AlarMax receive "the lowest price and most advantageous terms afforded" to any of its competitors, including ADI, when purchasing electronic security products from Honeywell. (ECF No. 26-2, at p. 5). "Exhibit A," attached to the Supply Agreement, lists electronic security products previously or currently purchased by AlarMax and provides the discount percentage applicable to each. (ECF No. 26-2, at pp. 15-20). According to Section 3.1(b), the price of any electronic security products "identified by AlarMax" which are not already included in Exhibit A must "be negotiated in good faith by the parties." (ECF No. 1, at ¶ 30; ECF No. 26-2, at p. 5). Section 2.1 states that Honeywell must continue to sell to AlarMax "Supplied Products," a term defined as electronic security products "that AlarMax previously bought or currently or in the future buys from . . . Honeywell." (ECF No. 26-2, at pp. 1-2).

In addition, under Section 2.4, the Supply Agreement additionally requires Honeywell to provide "reasonable technical and sales support . . . to AlarMax and customers of AlarMax" for electronic security products purchased. (ECF No. 1, at ¶ 31; ECF No. 26-2, at p. 3). Any breach of these, or the other terms of the Supply Agreement, would also constitute a breach of the Settlement Agreement. (ECF No. 26-1, at p. 5). The Supply Agreement was to remain in effect until terminated, ECF No. 26-2, at p. 9, which has yet to occur. (ECF No. 1, at ¶ 32). Both the

Settlement Agreement and Supply Agreement are governed by Pennsylvania law. (ECF No. 1, at ¶¶ 27, 32; ECF No. 26-1, at p. 2; ECF No. 26-2, at p. 11).

On July 9, 2012, AlarMax filed a Complaint in the Court of Common Pleas of Allegheny County, initiating an unrelated suit against Altronix Corporation ("Altronix"). (ECF No. 1, at ¶ 34; ECF No. 20-1). A March 18, 2014 court order in that proceeding required Altronix to produce ADI's distributor price information to AlarMax. (ECF No. 1-2, at ¶ 5). On April 10, 2014, Joshua Foster ("Foster"), Vice President and General Counsel of the Honeywell Security Group, of which ADI is a part, submitted an affidavit (the "Foster Affidavit") in support of Altronix's motion for reconsideration of that order. (ECF No. 1, at ¶ 33-34; ECF No. 1-2, at ¶¶ 1, 3, 4).

Prior to the Foster Affidavit, AlarMax contends that it had been unaware of any breaches of either the Settlement Agreement or Supply Agreement by Honeywell. (ECF No. 1, at ¶ 33). In this affidavit, Foster argues for the confidentiality of the subject pricing information, explaining that AlarMax could use the information "to adjust its prices to obtain maximum profit margin while potentially selling Altronix products at lower prices to undercut ADI." (ECF No. 1, at ¶ 36; ECF No. 1-2, at ¶ 10). Foster saw this as "an unfair competitive advantage" for AlarMax which could "erode the profit margins at which [ADI] sell[s] Altronix products." (Id.). These statements indicated to AlarMax that Honeywell was in knowing breach of the Settlement Agreement and Supply Agreement. (ECF No. 1, at ¶ 37-39).

After its suspicions were supposedly raised by the Foster Affidavit, AlarMax began researching Honeywell's marketplace activities and claims that "numerous, additional breaches" were uncovered. (ECF No. 1, at ¶ 40). Specifically, AlarMax located ADI sales flyers

advertising Fire-Lite, Silent Knight, and System Sensor electronic fire products at prices at or below those paid by AlarMax to Honeywell for those products. (ECF No. 1, at ¶ 45). AlarMax also found a 2011 ADI Vendor Agreement which requires vendors to offer products to ADI at the "lowest price (including incentives, rebates and other offers) and longest payment terms then-available to similarly situated customers," and then provides for additional discounts based on ADI's monthly purchases, payment activity, and display of a particular product.[3] (ECF No. 1, at ¶ 51; ECF No. 20-6, at p. 3). AlarMax alleges that a 2011 ADI PowerPoint presentation demonstrates that ADI is insistent that vendors sign this vendor agreement and touts the lower pricing ADI receives as a result. (ECF No. 1, at ¶ 55).

Aside from this newly-discovered documentary evidence, certain vendors have also allegedly disclosed potential breaches of the Settlement Agreement and Supply Agreement by Honeywell. Certain undisclosed vendors have repeatedly told AlarMax that ADI does not permit them to offer the same promotions and pricing to AlarMax as they offer to ADI. (ECF No. 1, at ¶ 62). Vendors like Edwards Signaling, Proficient Audio, Viking Electronics, and Arecont Vision have actually refused to sell to AlarMax, citing "exclusive agreements" with ADI and a fear of repercussions. (ECF No. 1, at ¶ 63). One unnamed electronic security product vendor has also raised its prices to all resellers but ADI to accommodate additional price concessions demanded by ADI. (ECF No. 1, at ¶ 66).

Specifically related to the Supply Agreement, AlarMax claims that Honeywell has refused to supply any electronic security products which were not originally included in Exhibit

---

[3] The 2011 ADI Vendor Agreement produced is unexecuted and leaves blank spaces where counter-party information would be filled in. (ECF No. 20-6). However, AlarMax alleges that it is "currently in use." (ECF No. 1, at ¶ 50).

A and has refused to provide any technical or sales support. (ECF No. 1, at ¶¶ 68-69). Counsel for AlarMax provided notice of each of these supposed breaches of the Settlement Agreement and Supply Agreement to Honeywell on May 30, 2014. (ECF No. 1, at ¶ 41). Although Honeywell has been requested to cure these breaches prior to litigation, it has failed to do so. (ECF No. 1, at ¶¶ 41-42).

AlarMax initiated the instant action by filing a two-count Complaint on November 6, 2014. (ECF No. 1). AlarMax asserts in Count I that Honeywell has breached both the Settlement Agreement and Supply Agreement. (ECF No. 1, at ¶¶ 71-77). In Count II, AlarMax claims that Honeywell has knowingly induced discriminatory pricing in violation of Section 2(f) of the Clayton Act, as amended by the RPA, 15 U.S.C. § 13(f). (ECF No. 1, at ¶¶ 78-91). After being granted an extension of time to file a responsive pleading or motion, ECF No. 9, Honeywell filed a timely Motion to Dismiss, supporting brief, and exhibits on January 7, 2015. (ECF Nos. 18-20, 22). AlarMax filed a responsive brief along with two exhibits, which it was permitted to file under seal, on July 28, 2015. (ECF Nos. 25-26). Honeywell filed a reply on February 11, 2015. (ECF No. 27). Honeywell's Motion to Dismiss is now ripe for disposition.

## C.    DISCUSSION

### 1.   Breach of Contract Claim

Count I asserts a claim for breach of contract. Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages." Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (citing CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). With respect to

the first element, Honeywell does not dispute the existence of either the Settlement Agreement or the Supply Agreement. (ECF No. 27, at p. 3). Likewise, Honeywell asserts no challenge to AlarMax's alleged damages. (ECF No. 1, at ¶ 76). Instead, Honeywell's "basis for dismissal is that AlarMax has not plausibly pled conduct that breaches the contracts at issue." (ECF No. 27, at p. 3). As such, the present inquiry will be limited to whether AlarMax has sufficiently plead facts which constitute breaches of the parties' contracts.

AlarMax asserts that Honeywell has breached a total of ten individual provisions of their agreements with Honeywell; six in the Settlement Agreement and four in the Supply Agreement. (ECF No. 1, at ¶¶ 73-74). Honeywell's conduct with respect to each of these provisions serves as a separate factual basis for an alleged breach by Honeywell. Honeywell argues extensively that AlarMax has failed to allege conduct with enough specificity to support a plausible conclusion that any of these breaches have occurred. (ECF No. 19, at pp. 22-32; ECF No. 27, pp. 2-6). The sufficiency of the sets of facts supporting each of Honeywell's alleged breaches must be evaluated in consideration of this early stage of the proceedings.

When considering a motion to dismiss, "bald assertions," "legal conclusions," and "legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness" generally afforded to well-pleaded allegations in the complaint. In re Rockefeller Ctr. Properties, Inc. Sec. Litig., 311 F.3d 198, 216 (3d Cir. 2002). As such, "[t]o adequately state a claim for breach of contract under Rule 12(b)(6), [a plaintiff] ha[s] to do more than simply assert that [the defendant] 'breached' or 'revoked' a contract." Chemtech Int'l, Inc. v. Chem. Injection Technologies, Inc., 170 F. App'x 805, 808 (3d Cir. 2006) ("Stating that a document was signed, that the document called for certain performance, and that performance did not occur are

10

all factual allegations that would underpin this legal conclusion."). However, the factual allegations provided need not be "detailed." Davis v. Abington Mem'l Hosp., 765 F.3d 236, 241 (3d Cir. 2014) (quoting Twombly, 550 U.S. at 555)). They must only "raise a reasonable expectation that discovery will reveal evidence of" the alleged breaches by Honeywell. Twombly, 550 U.S. at 556.

Given these guideposts, AlarMax's breach of contract claim will be permitted to proceed based on only five of the ten provisions it claims Honeywell has breached. While AlarMax has sufficiently alleged breaches of these five contractual provisions, no facts have been plead to support allegations that Honeywell breached Section 5(f) of the Settlement Agreement or any section in the Supply Agreement. Each of the provisions of the Settlement Agreement and Supply Agreement Honeywell is alleged to have breached will now be addressed.

### a) Sections 4(b) and 5(a) of the Settlement Agreement

The first two provisions of the Settlement Agreement that AlarMax alleges Honeywell has breached are Sections 4(b) and 5(a). Section 4(b) pertains only to electronic fire products, including Fire-Lite, Silent Knight, and System Sensor products, sold by Honeywell to AlarMax. (ECF No. 26-1, at p. 6). It provides that "AlarMax will not be disadvantaged on the final purchase price (including all discounts, rebates, or any other incentive programs), and/or payment or warranty terms for electronic fire products as compared to other third party distributors in the same channel or ADI." (Id.). Section 5(a) applies more broadly to "Electronic Fire *and* Security Products," but similarly requires that Honeywell "not commercially disadvantage AlarMax vis-á-vis other distributors (such as ADI)." (ECF No. 26-1, at pp. 6-7) (emphasis added).

AlarMax asserts that Honeywell has "disadvantaged" it on the final purchase price of electronic fire products, materially breaching both Sections 4(b) and 5(a) of the Settlement Agreement. (ECF No. 1, at ¶ 73). While no specific transactions are alleged, AlarMax has alleged general conduct by Honeywell with respect to electronic fire products which could constitute violations of these provisions. Specifically, AlarMax asserts that Honeywell has sold electronic fire products to ADI at ultimately lower prices than those charged of AlarMax, either through the use of simply lower prices or rebates. (ECF No. 1, at ¶¶ 44, 47). AlarMax also corroborates these allegations by citing certain ADI sales flyers listing prices for Fire-Lite, Silent Knight, and System Sensor electronic fire products which are equal to or below the prices AlarMax pays to Honeywell for the same products. (ECF No. 1, at ¶ 45). AlarMax argues that ADI's ability to sell these products at such prices proves that Honeywell is providing more favorable pricing to ADI. (ECF No. 1, at ¶ 47).

Honeywell responds that these flyers do not support the occurrence of a breach, because there are legitimate reasons for "sales at different prices, even at prices below cost." (ECF No. 19, at p. 29). As such, Honeywell argues that AlarMax has only actually pled that ADI is selling products at lower prices than AlarMax, which is proscribed by neither of the parties' agreements. (ECF No. 19, at p. 30). However, Honeywell's argument fails to recognize that one of those legitimate reasons a reseller would be willing to offer a lower price than a competitor is that it has paid a lower price for that product than the competitor. Assuming the veracity of these sales flyers and related allegations as is proper at this stage, their existence could support a plausible inference that Honeywell breached Sections 4(b) and 5(a) of the Settlement Agreement by selling electronic fire products to ADI at lower prices than it charged AlarMax. Therefore,

12

AlarMax's breach of contract claim may proceed with respect to alleged breaches of these provisions.

### b) Section 5(b) of the Settlement Agreement

The Settlement Agreement's Section 5(b), the third section that AlarMax alleges Honeywell has breached, provides that "Honeywell shall not induce or knowingly accept more favorable price or payment terms, as compared to AlarMax, from non-Honeywell manufacturers." (ECF No. 26-1, at p. 7). Honeywell may seek lower prices, "as long as Honeywell does not request that such pricing be exclusive to Honeywell." (Id.). AlarMax offers a purported 2011 ADI Vendor Agreement in support of its allegation that Honeywell has breached Section 5(b).[4] AlarMax argues that this agreement requires vendors to provide their lowest prices exclusively to ADI. This Court agrees with AlarMax in this regard. (ECF No. 1, at ¶ 73).

The 2011 ADI Vendor Agreement produces exclusive, favorable pricing to ADI by first requiring vendors to provide ADI the "lowest price (including incentives, rebates and other offers) and longest payment terms then-available to similarly situated customers." (ECF No. 1, at ¶ 51; ECF No. 20-6, at p. 2). Later, under its "Payment Terms" section, the agreement provides for a 2% deduction contingent upon timely payments by ADI and a non-contingent rebate equal to 5% of ADI's monthly purchases. (ECF No. 1, at ¶ 51; ECF No. 20-6, at p. 3). Together, these

---

[4] In further support of this allegation, AlarMax also claims that it "has requested the same promotions and pricing from vendors that ADI receives, but vendors have repeatedly stated that they are not permitted by ADI to do so." (ECF No. 1, at ¶ 62). This allegation certainly adds support to AlarMax's contention that Honeywell has breached Section 5(b) of the Settlement Agreement. However, because the 2011 ADI Vendor Agreement independently provides sufficient factual support for this contention, no additional consideration of relevant vendor statements is necessary.

terms require vendors to provide ADI further discounts off of what is already the lowest price. Given the foregoing, AlarMax argues that Honeywell's use of the 2011 ADI Vendor Agreement constitutes inducing or knowingly accepting more favorable pricing in breach of Section 5(b).

Honeywell makes two arguments that the 2011 ADI Vendor Agreement does not support a reasonable inference of breach by Honeywell. First, Honeywell attempts to argue that it is implausible to interpret this agreement as requiring additional discounts beyond the "lowest price." (ECF No. 19, at pp. 25-26). According to Honeywell, the "lowest price" should be read to include all "incentives, rebates or other offers," (ECF No. 19, at p. 26), presumably including those rebates specified in the "Payment Terms" section. This reading is implausible. The United States Court of Appeals for the Third Circuit has explained that "courts should not interpret contracts in a way that renders at least one clause superfluous or meaningless." Sloan & Co. v. Liberty Mut. Ins. Co., 653 F.3d 175, 181 (3d Cir. 2011). Under Honeywell's interpretation, the specific discounts mentioned in the "Payment Terms" section would be rendered meaningless. As such, these discounts must be read to be in addition to the "lowest price" required earlier.

This Court's reading of the 2011 ADI Vendor Agreement requires vendors to offer ADI discounts in addition to the "lowest price . . . then-available to similarly situated customers." (ECF No. 20-6, at p. 3). Thus, even assuming that a particular vendor considers AlarMax to be "similarly-situated," ADI would be entitled to at least an additional 5% discount from the "lowest price" offered to such customers.[5] (Id.). These discounts would necessarily be exclusive to ADI as offering them to other "similarly-situated" customers would further decrease the

---

[5] Any argument that AlarMax is not "similarly-situated" to ADI such that AlarMax would be entitled to a *better* price would be disingenuous given that ADI is "the largest wholesale distributor of electronic fire and security products in the world." (ECF No. 1, at ¶ 7).

"lowest price," then requiring additional discounts to ADI. Honeywell's use of such a contract would therefore constitute a breach of Section 5(b) of the Settlement Agreement by inducing more favorable price terms from non-Honeywell vendors as compared to AlarMax (and likely every other reseller of said vendor's products).

Honeywell's second argument with respect to the 2011 ADI Vendor Agreement is that, in the form it was presented to this Court, this document does not indicate an actual breach of either the Settlement Agreement of Supply Agreement. (ECF No. 19, at pp. 24-25). Specifically, Honeywell takes issue with this unexecuted document's lack of a counter-party and AlarMax's failure to plead specific details of any transactions conducted pursuant to the 2011 ADI Vendor Agreement. (Id.). Neither of these deficiencies is fatal at this stage.

To establish the occurrence of a breach, AlarMax has alleged a vendor agreement which, if used by ADI in a relationship with a vendor of electronic fire and/or security products, would likely constitute a breach. While AlarMax has yet to allege a specific vendor, common to both ADI and AlarMax, which has entered into the 2011 ADI Vendor Agreement, AlarMax has alleged that this agreement is "currently in use." (ECF No. 1, at ¶ 50). Further, AlarMax points to a 2011 ADI PowerPoint presentation "that demonstrates how insistent ADI has been that vendors sign the Vendor Agreement and touts the lower pricing ADI must receive." (ECF No. 1, at ¶ 55). Affording these allegations the presumption of truthfulness they are due at this stage, AlarMax is entitled to discovery as to any breaches resulting from Honeywell's use of the 2011 ADI Vendor Agreement.

Honeywell's argument that AlarMax must plead specific facts concerning actual transactions conducted pursuant to the 2011 ADI Vendor Agreement to support a reasonable

15

inference of a breach by Honeywell is also unconvincing. While Section 5(b) of the Settlement agreement can be breached by "knowingly accept[ing] more favorable price or payment terms, as compared to AlarMax," it can also be breached by Honeywell simply "inducing" such terms. (ECF No. 26-1, at p. 7). Even without actual transactions to show that Honeywell knowingly accepted better pricing, Honeywell would *induce* more favorable price terms, as compared to AlarMax, by only entering into the 2011 ADI Vendor Agreement. As AlarMax avers that this agreement is "currently in use," ECF No. 1, at ¶ 50, it has pled sufficient factual material to proceed on its breach of contract claim with respect to alleged breaches of Settlement Agreement Section 5(b).[6]

### c) Sections 5(c) and 5(d) of the Settlement Agreement

The fourth and fifth terms of the Settlement Agreement that AlarMax contends Honeywell has breached are Sections 5(c) and 5(d). Section 5(c) requires that "Honeywell shall not enter into exclusive sale or distribution agreements, or otherwise suggest, encourage or coerce exclusive dealings, with non-Honeywell manufacturers." (ECF No. 26-1, at pp. 7-8). According to Section 5(d), Honeywell must also "not facilitate, encourage or coerce non-Honeywell manufacturers to boycott AlarMax." (ECF No. 26-1, at p. 8).

To support its claim that Honeywell has breached these provisions, AlarMax alleges that "[v]endors such as Edwards Signaling, Proficient Audio, Viking Electronics, Arecont Vision,

---

[6] AlarMax also argues that the Foster Affidavit supports its allegation that Honeywell was receiving pricing from vendors which was better than those vendors made available to AlarMax. Specifically, AlarMax contends that Foster was arguing for the confidentiality of Honeywell's vendor pricing information to prevent AlarMax from discovering the lower prices Honeywell was paying. As other facts plead, including the 2011 ADI Vendor Agreement, sufficiently support AlarMax's allegation that Honeywell breached Section 5(b) of the Settlement Agreement, it is not necessary to determine whether such an inference would be reasonable.

and others have refused to sell to AlarMax because of exclusive agreements with ADI and the fear of repercussions from ADI." (ECF No. 1, at ¶ 63). Despite Honeywell's argument that this allegation is vague and lacks details, ECF No. 19, at ¶ 21, no more is required at this juncture. Assuming its truth, this allegation supports "a reasonable expectation that discovery will reveal evidence of" breaches of Sections 5(c) and 5(d) of the Settlement Agreement by Honeywell. <u>Twombly</u>, 550 U.S. at 556. Therefore, AlarMax's breach of contract claim must be permitted to proceed based on the alleged breaches of these sections.

### d) Section 5(f) of the Settlement Agreement

Section 5(f) is the sixth and final provision of the Settlement Agreement AlarMax asserts Honeywell has breached. This provision permits Honeywell to offer package discounts for its fire and security products, "so long as any products included in the package or kit that were previously offered separately are also offered separately and the pricing differential between the separate products and the packaged products is not such that it unlawfully coerces the package purchase." (ECF No. 26-1, at pp. 8-9).

Attempting to support its allegation that Honeywell has breached Section 5(f), AlarMax only claims that "Honeywell has materially breached" this section "by offering packaged discounts and kits with price differentials that coerce the package purchase." (ECF No. 1, at ¶ 73). This conclusory allegation does little more than restate Section 5(f) in an attempt to turn a legal conclusion into a factual allegation. As such, it is not entitled to the presumption of truthfulness. <u>In re Rockefeller Ctr. Properties, Inc. Sec. Litig.</u>, 311 F.3d at 216. Despite AlarMax's contention that paragraphs 50-66 of the Complaint set forth facts demonstrating that Honeywell has offered such package discounts, ECF No. 25, at p. 18, these paragraphs, as well

as all others, are completely silent as to such actions by Honeywell. Given the complete lack of factual support for Honeywell's alleged breach of Section 5(f) of the Settlement Agreement, AlarMax's breach of contract claim should be limited to preclude reliance on such a breach.

### e) Section 2.1 of the Supply Agreement

The remainder of AlarMax's allegations of breach by Honeywell pertains to provisions of the Supply Agreement. The first provision of the Supply Agreement AlarMax claims Honeywell has violated is Section 2.1. It provides that "[Honeywell] shall manufacture, assemble, package and sell to AlarMax, and AlarMax shall purchase from [Honeywell], the Supplied Products in the quantity ordered by AlarMax from time to time as provided by this Supply Agreement," subject to certain irrelevant exceptions. (ECF No. 26-2, at p. 3). The term "Supplied Products" is defined to mean "all Electronic Security Products (not including electronic fire products) that AlarMax previously bought or currently or in the future buys from companies Honeywell acquired or will acquire." (ECF No. 26-2, at p. 2). AlarMax contends that Honeywell has violated Section 2.1 by refusing to sell electronic security products in addition to those previously purchased by AlarMax. (ECF No. 1, at ¶ 74). This allegation, the only one relevant to Section 2.1, fails to support the reasonable inference that it was breached in any way by Honeywell.

AlarMax's argument that Honeywell has breached Section 2.1 is based on the premise that the section's use of the term "Supplied Products" somehow gives AlarMax the right to buy any of the electronic security products it has not previously purchased from Honeywell. (Id.). This premise is faulty. Because a product only becomes a Supplied Product once AlarMax "buys" that product, Supplied Products can only include those which AlarMax had yet to

purchase at the time the Supply Agreement was executed if AlarMax buys such a product from either Honeywell or a company which is subsequently acquired by Honeywell. (See ECF No. 26-2, at p. 2). As such, if AlarMax has yet to buy a certain product from either Honeywell or one of its acquired companies, AlarMax's offer to purchase that product alone does not trigger Honeywell's obligation to provide it.

AlarMax has not alleged that it had previously bought a single electronic security product from either Honeywell or a company acquired by Honeywell which Honeywell subsequently refused to sell to AlarMax. Therefore, AlarMax has failed to plead sufficient factual matter to support a reasonable inference that Honeywell breached Supply Agreement Section 2.1, and AlarMax's breach of contract claim should be limited to exclude reliance on any alleged breaches of this section.

### f) Section 2.4 of the Supply Agreement

The next provision of the Supply Agreement that AlarMax claims Honeywell has breached is Section 2.4. Pursuant to Section 2.4, Honeywell must "provide to AlarMax and customers of AlarMax, reasonable technical and sales support regarding the Supplied Products." (ECF No. 26-2, at p. 3). AlarMax argues Honeywell breached this section by "failing to provide any 'technical and sales support regarding' the products that AlarMax purchases from Honeywell." (ECF No. 1, at ¶ 74). No additional facts are alleged in support of such a breach. Assuming the truth of the lone relevant allegation, AlarMax has still failed to support a reasonable inference that Honeywell breached Section 2.4.

Honeywell's "failure" to provide technical and sales support on its own would not constitute a breach of Section 2.4. This section only requires that Honeywell provide a

*reasonable* level of such support. (ECF No. 26-2, at p. 3). Accepting that Honeywell has provided absolutely no technical or sales support to AlarMax since the execution of the Supply Agreement, AlarMax has alleged no facts which would suggest that this would have been *unreasonable*. Although AlarMax characterizes Honeywell's actions with regard to providing support as a "failure," AlarMax does not allege that Honeywell has actually denied requests for support or even that any such requests were made. As AlarMax has not plead sufficient facts to support a reasonable inference that Honeywell did not provide reasonable technical and sales support, a breach of Section 2.4 of the Supply Agreement has not been adequately established. AlarMax's breach of contract claim should be limited such that it may not rely on any alleged breaches of this section.[7]

### g) Section 3.1(b) of the Supply Agreement

AlarMax has likewise failed to plead sufficient facts to permit a reasonable inference that Honeywell has breached Section 3.1(b) of the Supply Agreement. According to Section 3.1(b), "[i]f any additional Supplied Products are identified by AlarMax or become part of this Agreement by virtue of [Honeywell's] acquisition of any additional Electronic Security Products, the price for such new Supplied Products will be negotiated in good faith." (ECF No. 26-2, at p. 5). AlarMax asserts that Honeywell has breached this provision by "refusing to negotiate pricing for new Electronic Security Products not originally included in the list of products attached to the Supply Agreement." (ECF No. 1, at ¶ 74). No additional facts are plead to support AlarMax's contention that Honeywell breached Section 3.1(b).

---

[7] In addition to failing to support a reasonable inference of a breach in this instance, AlarMax has also alleged no damages which could have resulted from a breach of Section 2.4. However, it is unnecessary to consider the damages element as the parties have failed to raise it and because AlarMax has failed to plead a breach of Section 2.4.

AlarMax has failed to support a reasonable inference of a breach with respect to Section 3.1(b) for two reasons. First, AlarMax has not alleged "any additional Supplied Products" which were identified by AlarMax or otherwise became part of the agreement, as would be required to trigger any obligation of Honeywell to negotiate the prices of those products under Section 3.1(b). Second, AlarMax has offered no facts which could suggest that any lack of negotiation by Honeywell was not in good faith. Having failed to adequately support its contention that Honeywell breached Section 3.1(b) of the Supply Agreement, AlarMax's breach of contract claim must be narrowed to any reliance on Honeywell's alleged breaches of this section.

**h) Section 3.2 of the Supply Agreement**

Finally, AlarMax's factual allegations regarding a purported breach of Section 3.2 of the Supply Agreement by Honeywell are also insufficient. In relevant part, similar to Section 4(b) of the Settlement Agreement, Section 3.2 declares that "AlarMax will not be disadvantaged on the final purchase price (including all discounts, rebates, or any other incentive programs) and/or payment or warranty terms as compared to other Low Voltage Distributors." (ECF No. 26-2, at p. 5). These terms are distinguishable from Section 4(b) of the Settlement Agreement, however, in that Section 3.2 of the Supply Agreement addresses only sales of electronic security products, ECF No. 26-2, at pp. 2, 5, where Section 4(b) of the Settlement Agreement is concerned with electronic fire products. (ECF No. 26-1, at p. 5). In its only allegation in support of a breach of Section 3.2 by Honeywell, AlarMax asserts that Honeywell "disadvantage[ed] AlarMax on the final purchase price and payment terms (including all discounts, rebates, or any other incentive programs) for Electronic Security Products as compared to other distributors." (ECF No. 1, at ¶

74).  On its own, this entirely conclusory allegation is not enough to support the inference of a breach of Section 3.2.

The factual allegations AlarMax has pled in support of its claim that Honeywell breached Section 3.2 differ drastically from those which sufficiently supported Honeywell's purported breach of Section 4(b) of the Settlement Agreement.  With respect to Section 4(b), AlarMax presented several allegations of conduct by Honeywell with respect to electronic fire products which would constitute a breach.  (ECF No. 1, at ¶¶ 44, 46-47, 73).  AlarMax also cited to sales flyers, which referenced those same products, to corroborate these allegations.  (ECF No. 1, at ¶ 45).  Conversely, AlarMax has alleged no conduct by Honeywell regarding electronic security products which, if believed, could constitute a breach of Section 3.2 of the Supply Agreement. Instead, AlarMax's only relevant allegation consists of a slight reformulation of the language of Section 3.2 in an attempt to disguise a legal conclusion as a factual allegation.  As AlarMax has done no more than summarily proclaim that Honeywell has breached Section 3.2 of the Supply Agreement, its breach of contract claim cannot proceed insofar as it relies on breaches of Section 3.2.  Chemtech Int'l, Inc., 170 F. App'x at 808.

## 2.  Robinson-Patman Claim

### a)  Overview

In Count II, AlarMax asserts a claim against Honeywell for price discrimination as defined by § 2 of the Clayton Act, as amended by the RPA, 15 U.S.C. § 13.  Specifically, AlarMax alleges that Honeywell has acted in violation of Section 13(f) by knowingly inducing and receiving discriminatory pricing.  (ECF No. 1, at ¶ 90).  Honeywell moves for dismissal of AlarMax's RPA claim on two separate grounds.  First, AlarMax "does not identify a <u>single</u>

product that was actually sold by a single vendor at a certain point in time to both AlarMax and

Honeywell, not to mention at different prices." (ECF No. 19, at p. 6) (emphasis in original).

Essentially, Honeywell argues that AlarMax has plead insufficient details for this Court to permit

the RPA claim to proceed. Second, Honeywell asserts that AlarMax has alleged no facts which

show that Honeywell "knowingly" induced or received unlawful discriminatory prices. (ECF

No. 19, at p. 6). Neither of these arguments is convincing.

     The RPA provides, in relevant part:

> It shall be unlawful for any person engaged in commerce . . . to
> discriminate in price between different purchasers of commodities
> of like grade and quality, . . . where the effect of such
> discrimination may be substantially to lessen competition or tend
> to create a monopoly in any line of commerce, or to injure,
> destroy, or prevent competition with any person who either grants
> or knowingly receives the benefit of such discrimination, or with
> customers of either of them . . . .

15 U.S.C. § 13(a). Buyers can also be held liable for such practices by "knowingly [] induc[ing]

or receiv[ing] a discrimination in price which is prohibited by this section." 15 U.S.C. § 13(f).

To state a claim against a buyer for a violation of § 13(f), the plaintiff must make two showings.

First, it must show that a *prima facie* case for price discrimination under § 13(a) could be

established against a common seller. Feesers, Inc. v. Michael Foods, Inc., 591 F.3d 191, 209 (3d

Cir. 2010) (quoting Great Atl. & Pac. Tea Co. v. F.T.C., 440 U.S. 69, 76 (1979) ("[A] buyer

cannot be liable if a *prima facie* case could not be established against a seller."). Second, it must

show that the buyer induced and/or received such discriminatory pricing "knowingly." § 13(f).

### b) Section 13(a) case against a seller

     To state a claim against a seller under § 13(a), "a plaintiff must allege facts to

demonstrate that (1) the [seller] made at least two contemporary sales of the same commodity at

different prices to different purchasers; and (2) the effect of such discrimination was to injure competition." Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc., 159 F.3d 129, 142 (3d Cir. 1998) (citing Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 219-27 (1993)). Honeywell takes no issue with AlarMax's allegation that the effect of Honeywell's actions "has been to substantially lessen competition in the wholesale distribution of Electronic Fire and Security Products." (ECF No. 1, at ¶ 89). As such, AlarMax is assumed to have satisfied the second element for the purposes of the present inquiry. Instead, Honeywell only argues that AlarMax has failed to allege sufficient facts to satisfy its burden with respect to the first element. However, the level of detail argued for by Honeywell is not required at this early stage of the proceedings.

To satisfy the first element of the § 13(a) analysis, the plaintiff must plead "actual sales at two different prices to two different actual buyers." Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 228 (3d Cir. 2008). Honeywell argues that AlarMax has not sufficiently plead *actual* sales because it has "not plead which products it bought, from whom, at what time, and at what allegedly higher prices than Honeywell paid for the same products." (ECF No. 19, at p. 6). Honeywell points to no mandatory authority which requires sales to be plead with this level of detail to be considered *actual*. Instead, the United States Court of Appeals for the Third Circuit has only distinguished situations involving "two *actual* sales" from those involving only a single sale, id., and those in which only an offer to sell has been made. Crossroads Cogeneration Corp., 159 F.3d at 142. Given this, AlarMax's factual allegations are sufficient to satisfy the first element of the § 13(a) analysis.

In its Complaint, AlarMax alleges that "Honeywell/ADI has knowingly induced discriminatory prices . . . from non-Honeywell vendors with respect to Electronic Fire and Security Products for re-sale that are substantially more favorable than those vendors offer or sell to AlarMax or other distributors." (ECF No. 1, at ¶ 80). AlarMax asserts that these products are "the same products, of the same grade and quality, contemporaneously sold to AlarMax." (ECF No. 1, at ¶ 82). Slightly more specifically, AlarMax claims that "Altronix, Wheelock, RCI, Ditek, Bosch, Flir and others have sold their Electronic Fire and Security Products to AlarMax at prices higher than the ones paid contemporaneously by Honeywell/ADI." (ECF No. 1, at ¶ 84). On their own, these assertions are unquestionably conclusory, being little more than restatements of the elements of a § 13(a) violation as purported facts. However, considering these claims along with the 2011 ADI Vendor Agreement and AlarMax's allegations concerning it, which must be accepted as true at this stage, it is plausible that sellers were charging AlarMax higher prices for the same products contemporaneously sold to it and Honeywell.

As discussed above, the 2011 ADI Vendor Agreement requires that Honeywell receive lower pricing from vendors than any of its competitors by requiring that it be offered certain discounts off of the "lowest price . . . then-available to similarly situated customers." (ECF No. 20-6, at pp. 2-3). While AlarMax has not alleged which manufacturers of electronic fire and security products have entered into this agreement with ADI, it has asserted that the 2011 ADI Vendor Agreement is "currently in place" and that Honeywell has induced discriminatory pricing "in connection with" it. (ECF No. 1, at ¶ 86). AlarMax also points to a 2011 ADI PowerPoint presentation that "demonstrates how insistent ADI has been that vendors sign the Vendor Agreement." (ECF No. 1, at ¶ 55). Accepting that at least some of the vendors of electronic fire

and security products that ADI and AlarMax do business with have become party to the 2011 ADI Vendor Agreement, it is likely that AlarMax has been paying more for any of those vendors' products bought contemporaneously by it and Honeywell. As such, AlarMax has plead sufficient facts to satisfy the first element of the § 13(a) analysis, establishing a *prima facie* case for its breach.

### c) Honeywell knowingly induced and/or received discriminatory pricing

Having established that a *prima facie* case for price discrimination under § 13(a) could be brought against a common seller, AlarMax must plead sufficient facts to support a reasonable inference that Honeywell induced and/or received such pricing "knowingly." § 13(f). "Buyers are not liable if they are innocent beneficiaries of discriminatory prices. [A p]laintiff thus bears the burden of showing that the buyer knew both that (1) he was receiving a lower price than a competitor and (2) the seller would have 'little likelihood of a defense' for offering that price." Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc., 723 F.3d 1019, 1022 (9th Cir. 2013) (citing Automatic Canteen Co. of Am. v. FTC, 346 U.S. 61, 70–71, 74, 79-80 (1953)). Despite Honeywell's assertions to the contrary, AlarMax has plead sufficient facts to plausibly suggest that Honeywell knew the prices it was receiving were illegal.

AlarMax has alleged repeatedly that Honeywell has "knowingly induced discriminatory prices." (ECF No. 1, at ¶¶ 80, 82, 83, 86, 87, 88, 89). Its strongest support for this assertion once again comes from the 2011 ADI Vendor Agreement. By entering into this agreement with a given vendor, Honeywell would be assured of better pricing from that vendor to the detriment of all of its competitors, including AlarMax. There is also no indication that vendors could benefit from any of the applicable defenses to offering such illegal pricing to Honeywell.

Therefore, it is reasonable to infer that, by employing the 2011 ADI Vendor Agreement, Honeywell induced, and then received pricing it knew was illegally discriminatory to AlarMax, among others.[8]  As such, AlarMax's claim for Honeywell's violation of § 13(f) must be permitted to proceed.

## IV.     CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendant's Motion to Dismiss (ECF No. 18) be GRANTED in part and DENIED in part.  The Motion should be GRANTED insofar as AlarMax bases its breach of contract claim on breaches of Section 5(f) of the Settlement Agreement or any of the identified sections of the Supply Agreement by Honeywell, and DENIED in all other respects.[9]

---

[8] AlarMax also points to the Foster Affidavit in support of its claim that Honeywell was knowingly receiving illegal discriminatory pricing.  AlarMax argues that Foster's desire for confidentiality supports an inference that Honeywell was knowingly receiving discriminatory pricing from vendors.  (ECF No. 1, at ¶ 37).  Having reviewed the content of this affidavit, the Court finds that any inference to this effect is unreasonable.

[9] Accordingly, AlarMax's breach of contract claim (Count I) may proceed based on Honeywell's alleged breaches of Sections 4(b), 5(a), 5(b), 5(c), and 5(d) of the Settlement Agreement only. AlarMax may also proceed on its Robinson-Patman claim (Count II).

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Objections are to be submitted to the Clerk of Court, United States District Court, 700 Grant Street, Room 3110, Pittsburgh, PA 15219.  Failure to timely file objections will waive the right to appeal. <u>Brightwell v. Lehman</u>, 637 F.3d 187, 193 n.7 (3d Cir. 2011).  Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.


<u>/s/ Maureen P. Kelly</u>
MAUREEN P. KELLY
CHIEF UNITED STATES MAGISTRATE JUDGE


Dated: May 4, 2015


cc:     All counsel of record by Notice of Electronic Filing